**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-3024
_____

JENNIFER DUNCAN,
                    Appellant

v.

GOVERNOR OF THE VIRGIN ISLANDS; KIRK
CALLWOOD, SR., Department of Finance; DIRECTOR
VIRGIN ISLANDS BUREAU OF INTERNAL REVENUE;
GOVERNMENT OF THE VIRGIN ISLANDS
_____

On Appeal from the District Court of the
Virgin Islands of United States
(D.C. No. 3-18-cv-00057)
District Judge:  Hon. Robert A. Molloy
_____

Argued May 9, 2022

Before:   JORDAN, MATEY, and ROTH, *Circuit Judges*.

(Filed August 31, 2022)
_____

Joseph A. DiRuzzo, III  [ARGUED]
Alexander Golubitsky
Daniel M. Lader
DiRuzzo & Company
401 East Las Olas Blvd. – Suite 1400
Fort Lauderdale, FL  33301
        *Counsel for Appellant*

Kenneth Case
Aquannette Chinnery-Montell
Ian S.A. Clement  [ARGUED]
Ariel M. Smith-Francois
Office of Attorney General of Virgin Islands
Department of Justice
34-38 Kronprindsens Gade
GERS Complex, 2nd Floor
St. Thomas, VI  00802
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Jennifer Duncan brought a putative class-action lawsuit against the Government of the Virgin Islands and certain of its high-ranking officials (collectively, the "Territory"), seeking to end what Duncan describes as the Territory's practice of delaying income tax refund checks for most taxpayers but expediting refunds for certain favored taxpayers and government employees.  This interlocutory appeal of the District Court's denial of class certification hinges largely on

the legal effect of a single fact: Duncan's receipt of a refund check from the Territory during the pendency of her lawsuit. The District Court held that the refund check, while not in the amount Duncan says she is owed, called into question Duncan's standing to press certain claims and made all of her claims atypical of the claims of the putative class. The Court also held that Duncan failed to meet her burden of proving that she was an adequate representative of the class.

Although the District Court's handling of this class-certification dispute was thoughtful, we disagree with its conclusion that the mid-litigation refund check deprived Duncan of standing and rendered all of her claims atypical. And, in evaluating whether Duncan was an adequate representative, the District Court applied a legal standard inconsistent with our precedent. We will therefore vacate the order denying Duncan's motion for class certification and remand for further consideration.

## I.    BACKGROUND

### A.    The Lawsuit

Duncan makes no secret of what inspired her lawsuit. It was a similar class action against the Government of Guam. In *Paeste v. Government of Guam*, the Ninth Circuit affirmed the grant of summary judgment to Guam taxpayers in their class-action lawsuit against the territorial government. 798 F.3d 1228, 1231 (9th Cir. 2015). Struggling with budget deficits, Guam had excessively withheld income taxes to support government spending, rather than refunding the excess taxes. *Id.* Some taxpayers got their refunds, however, through an "expedited refund" process that devolved into arbitrariness and

3

favoritism. *Id.* The Ninth Circuit held that the challenged process violated the Organic Act of Guam and the Equal Protection Clause of the Fourteenth Amendment. *Id.* As Duncan emphasizes here, the district court in *Paeste* certified a class of taxpayers who were entitled to, but did not receive, timely tax refunds. *Id.* at 1232 & n.3.

"Having been inspired by the *Paeste* litigation … , Duncan brought her action seeking to cause systemic change" in the Virgin Islands income tax collection practices, those taxes being the Territory's largest source of revenue. (Opening Br. at 4-5.) In her original class-action complaint, filed in August 2018, Duncan alleged that the Territory owed taxpayers at least $97,849,992.74 in refunds for the years 2007 through 2017. She also alleged that, for the years 2011 through 2017, the Territory failed to comply with the requirement in title 33, section 1102(b) of the Virgin Islands Code, that the Territory set aside ten percent of collected income taxes for the purpose of paying refunds. As a consequence, she said, the Territory left underfunded by more than $150 million the required reserve for meeting those obligations.

Shortly after filing her original complaint, Duncan moved for class certification. The District Court ordered class discovery, during which Duncan deposed Marcella Somersall, a recently retired employee of the Virgin Islands Bureau of Internal Revenue (the "Bureau") who was "familiar with the process of expedited refunds[.]" (J.A. at 54.) Somersall explained that the Bureau makes expedited refunds available on an ad hoc basis to taxpayers experiencing a hardship, such as a medical emergency or home displacement, if they write a letter requesting an expedited refund. The director of the Bureau reviews each request and decides whether to approve

4

or reject it. That decision is not subject to further review. According to Somersall, the existence of the expedited refund process has not been made public, and at least some procedures for approving and denying requests are not written down. She also testified that refunds were expedited automatically, without a request, for all Bureau employees and for the employees at the Department of Finance who processed refund checks, as a "test to make sure that the files that went to Finance [were] correct[.]" (J.A. at 85-86, 88-89.)

Armed with Somersall's deposition testimony, Duncan filed the now-operative First Amended Class Action Complaint (the "Amended Complaint"). In general, that pleading alleges that the Territory failed to timely pay income tax refunds to nearly all taxpayers, while secretly allowing expedited refunds for certain taxpayers, including all Bureau employees and some Department of Finance employees. The Amended Complaint sets forth five causes of action:

1. A refund action, pursuant to 26 U.S.C. ("I.R.C.") § 7422 and title 33, section 1692 of the Virgin Islands Code;

2. A petition for a writ of mandamus ordering the commissioner of the Department of Finance and the director of the Bureau to set aside ten percent of income taxes for refunds, as required by title 33, section 1102(b) of the Virgin Islands Code;

3. A request for declaratory and injunctive relief based on violations of the Fourteenth Amendment by delaying refunds to taxpayers generally while creating a separate class of taxpayers given expedited refunds;

4. A request for declaratory and injunctive relief based on violations of the Fourteenth Amendment by automatically expediting refunds for all Bureau employees and some Department of Finance employees; and

5. A request for declaratory and injunctive relief based on violations of the Virgin Islands' equivalent of the Administrative Procedure Act, V.I. Code Ann. tit. 3, §§ 911 *et seq.*, by creating an expedited refund process outside of the prescribed rulemaking process.

The Amended Complaint also spells out the following proposed class:

> All persons and entities who: (a) have filed a timely claim for refund of an overpayment of the Virgin Islands Territorial Income Tax for any tax year from at least 2003 to the present, (b) have not been given by the USVI or the [Bureau], via certified or registered mail, a timely notice of disallowance of such claims, and (c) have not been paid such refunds by the USVI.

(J.A. at 139.)

### B. Duncan's Refund

During class discovery, Duncan received from the Territory a notice of "Arithmetic Correction" for her 2016 tax return – the one year for which she claimed an unpaid refund. (J.A. at 27.) The tax refund she sought for that year was $7,104, but the Territory reduced the amount to $2,474, for reasons unexplained by the notice. The Territory and

6

Duncan's attorney subsequently corresponded "regarding [Duncan's] refund check[,]" and while the exact substance of those conversations is unclear, Duncan's attorney did "indicate[] that [he] would let [the Territory] know" whether Duncan would accept the reduced refund. (J.A. at 31.) Ultimately, without a response from Duncan, the Territory went ahead and issued her a refund check for $2,738.30 on July 19, 2019.[1]

Duncan later represented to the District Court that she contested the validity of the Arithmetic Correction, and she testified in a deposition that she did not cash the check because she disagreed with the reduced refund amount. She also told the Court that, "[p]ursuant to [I.R.C.] § 6213(b), as mirrored to the United States Virgin Islands,"[2] the fact that she contested the notice "invalidates such notice, and the Virgin Islands Bureau of Internal Revenue must issue[] a Statutory Notice of Deficiency should it wish to assert the proposed adjustments again." (J.A. at 25-26.)

---

[1] No explanation is given for why the issued amount of $2,738.30 was higher than the amount of $2,474 listed on the notice of Arithmetic Correction.

[2] As explained in more detail below, *infra* note 9, Congress has provided that Virgin Islands tax laws are to "mirror" (or apply) federal tax law, except that the proceeds of taxes in the Virgin Islands are paid into the treasury of the Territory.

7

### C. The District Court's Class-Certification Decision

Following the close of class discovery, the District Court denied Duncan's motion to certify the proposed class. In its analysis of the prerequisites for class certification set out in Federal Rule of Civil Procedure 23(a),[3] it concluded that Duncan had met the first two: numerosity, because the proposed class consists of 24,364 individuals and 49 corporations; and commonality, because the question of whether the Territory has been delinquent in paying income tax refunds is common to the class.

The Court held, however, that Duncan failed to meet the typicality prerequisite under Rule 23(a)(3) because she had received a refund check. Even though Duncan disagreed with the refund amount and did not cash the check, her dispute with the Territory had become one about calculation, not about nonpayment, the Court said, and so her claim was different from those of the rest of the class. The Court also decided, in the context of its typicality analysis, that Duncan lacked Article III standing to pursue her claims for declaratory and injunctive

---

[3] Those prerequisites are:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

relief. It determined that she could not rely on the Virgin Islands' taxpayer-suit statute, V.I. Code Ann. tit. 5, § 80,[4] to establish standing, because standing in federal court is determined by federal law.

Duncan likewise failed to convince the District Court that she was an adequate representative under Rule 23(a)(4). The Court cited three reasons for that conclusion. First, it said that, although Duncan declared her "interests … to be perfectly aligned with those of the absent class members" (D.I. 8 at 9-10), that assertion was unsupported by any evidence. Second, it noted that Duncan focused on the adequacy of her lawyers to represent the class, which is a separate issue governed by Rule 23(g),[5] and she did not address the concern with her own adequacy to represent the class. Third, in keeping with its analysis of the typicality prerequisite, the Court said that Duncan's receipt of a refund check presented "significant questions" as to whether her interests were aligned with those of the class. (J.A. at 14.)

---

[4] That statute provides, "A taxpayer may maintain an action to restrain illegal or unauthorized acts by a territorial officer or employee, or the wrongful disbursement of territorial funds." V.I. Code Ann. tit. 5, § 80.

[5] That rule requires a court certifying a class to appoint class counsel, which it must do after considering, among any other pertinent factors, the work that proposed counsel has already done in the action, proposed counsel's experience and knowledge, and the resources proposed counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1).

Because the Court concluded that Duncan failed to meet all four prerequisites under Rule 23(a), it declined to reach the issue of what type of class to certify under Rule 23(b). Duncan then petitioned us pursuant to Rule 23(f) for leave to appeal the District Court's denial of class certification. We granted the petition.

## II. DISCUSSION[6]

On appeal, Duncan argues that the District Court abused its discretion in denying her motion for class certification. Before examining those arguments focused on Rule 23(a), however, we address the justiciability concerns raised by the District Court.

### A. Article III Justiciability

We agree with Duncan that the District Court erred in concluding that her mid-litigation receipt of a refund check deprived her of constitutional standing to pursue her claims.[7]

---

[6] The District Court's jurisdiction is in question and is discussed in Section II.A of this opinion. It is our ultimate conclusion that the Court had jurisdiction under 28 U.S.C. § 1331 and 48 U.S.C. § 1612. We have jurisdiction pursuant to 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f), and "[w]e [always] have jurisdiction to review our own jurisdiction when it is in doubt[.]" *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 222 (3d Cir. 2007).

[7] We take the District Court's conclusion to apply not only to Duncan's three requests for declaratory and injunctive relief but also to her request for a writ of mandamus. And

Although the Court's conclusion was couched as one pertaining to typicality under Federal Rule 23(a)(3), it can and must be analyzed separately, because standing is a jurisdictional doctrine that demands its own inquiry – apart from and before a decision on whether Duncan satisfies the typicality prerequisite for class certification. *See Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 130 (3d Cir. 2022) (addressing "directly, as a question of jurisdiction[,]" an argument that plaintiffs' lack of standing destroyed typicality); *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 480 (3d Cir. 2018) ("[T]he standing inquiry must be limited to a consideration of the class representatives themselves, after which we may 'employ Rule 23 to ensure that classes are properly certified.'").

The District Court's merging of those two legal concepts – standing and typicality – was an understandable but significant misstep. Although "[t]he concepts of standing and Rule 23(a) … appear related as they both aim to measure whether the proper party is before the court to tender the issues for litigation[,] … they are in fact independent criteria." 1 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 2:6 (6th ed. 2022) [hereinafter Rubenstein]. Standing and typicality differ in the sources of law from which they derive: the former, from the "case or controversy" requirement in Article III of the U.S. Constitution, *see* U.S. Const. art. III, § 2, cl. 1; *see also Free Speech Coal., Inc. v.*

---

although the Court did not question Duncan's standing to bring her refund action, its reasoning could just as easily apply to that claim too. Our discussion here thus applies to all five causes of action.

*Att'y Gen.*, 974 F.3d 408, 421 (3d Cir. 2020) ("Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.'" (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019))); and the latter, from Federal Rule of Civil Procedure 23(a)(3), *see In re Nat'l Football League Players Concussion Injury Litig.* (*In re NFL*), 821 F.3d 410, 427 (3d Cir. 2016) ("Rule 23(a)(3) requires that the class representatives' claims be 'typical of the claims … of the class.'" (omission in original) (quoting Fed. R. Civ. P. 23(a)(3))).  There's an important practical difference too.  "[A] lack of standing necessitates dismissal of claims, whether brought in a class action or in any other kind of suit[,]" while a lack of typicality simply results in the denial of class certification.  *Boley*, 36 F.4th at 130; *accord* 1 Rubenstein § 2:6.  Accordingly, to the extent the District Court thought that Duncan, the only named plaintiff in this purported class action, lacked standing to assert her claims, the appropriate remedy would have been to dismiss those claims, not deny class certification.

The District Court also erred insofar as it believed that the justiciability doctrine implicated by the mid-litigation refund check was standing, as opposed to mootness.  "Standing and mootness are 'two distinct justiciability doctrines.'" *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020).  Standing looks to whether a live controversy exists "[a]t the start of litigation," while mootness examines whether "some development" occurred during the litigation such "that there is no longer a live controversy." *Id.* at 305-06.  Because the parties here agree that any justiciability concerns stem from the effect of the refund check that Duncan received almost a year after she initiated this lawsuit – and because Duncan

clearly appears to have had standing at the start of the case – the pertinent justiciability doctrine is mootness.

The difference is not merely one of semantics. Looking at the refund check as raising a question of mootness makes it easier for Duncan to stay in federal court. "At the start of litigation, the burden rests on the plaintiff, 'as the party invoking federal jurisdiction,' to show [her] standing to sue." *Id.* at 305 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Once standing is shown at the outset, however, the defendant then bears the "heavy burden" of persuading a court that the case has become moot. *Id.* at 305-06 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). Further, as we observed in *Richardson v. Bledsoe*, "Article III mootness is more 'flexible' than other justiciability requirements, especially in the context of class action litigation." 829 F.3d 273, 278 (3d Cir. 2016) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 400 (1980)). In that context, "special mootness rules apply." *Brown v. Phila. Hous. Auth.*, 350 F.3d 338, 343 (3d Cir. 2003).

One such rule is the so-called "picking off" exception to mootness. That exception, as explained in *Richardson*, is a specific application of the relation-back principle and "permits courts to relate a would-be class representative's (now moot) claim for relief back in time to a point at which that plaintiff still had a personal stake in the outcome of the litigation." 829 F.3d at 279; *accord Paeste*, 798 F.3d at 1233 (observing in passing that "the named plaintiffs' refunds were expedited, even though they submitted no requests for expedited treatment, in an apparent attempt to render this case moot"). The picking-off exception allows a plaintiff to continue representing a class, notwithstanding otherwise mooted claims,

13

if two conditions are met: first, that "an individual plaintiff's claim for relief is acutely susceptible to mootness"; and second, that "it is clear from the complaint that the plaintiff is seeking to represent a class[.]" *Richardson*, 829 F.3d at 286; *accord LaSpina v. SEIU Pa. State Council*, 985 F.3d 278, 290 (3d Cir. 2021) ("[W]hen a plaintiff files a motion to certify a class when his individual claim still is live, the mooting of that claim while the motion is pending permits the court to decide the certification motion.").

It is quite possible that the Territory has not met its heavy burden of demonstrating that Duncan's individual claims are moot, making resort to the picking-off exception to mootness arguably unnecessary. While in *Richardson* the plaintiff's "individual claim for relief" undoubtedly "ha[d] become moot[,]" 829 F.3d at 279, it is not at all clear that the Territory can say that of Duncan's claims. True enough, the Territory issued a refund check to Duncan, so she is not entirely a victim of the unpaid-refund process she has described. But she has not received all that she claims she is owed. She maintains that she was entitled to a refund of $7,104 but received a check for only $2,738.30. That "partial remedy" might not moot her claims. *See Calderon v. Moore*, 518 U.S. 149, 150 (1996) (per curiam) ("[E]ven the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'" (alteration in original)); *see also United States v. Washington*, 142 S. Ct. 1976, 1983 (2022) ("If there is money at stake, the case is not moot.").

On the other hand, the check for $2,738.30 may be a complete remedy if, as the Arithmetic Correction notice represents, Duncan's itemized deductions were incorrectly computed and the amount of the check reflects the proper

14

refund amount to which she is entitled. Although Duncan claims that she "has not received the full value of the income tax refund (i.e., she is still owed $4,365.70, plus statutory interest)" (Opening Br. at 21), she never actually states what she believes is wrong with the new calculation. She instead relies primarily on what she's done since receiving the refund check. Namely, she points to her refusal to cash that check, which she likens to rejecting a settlement offer or an offer of judgment.[8] Since such offers cannot moot a case when they are not accepted, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165-66 (2016), her position is sensible advocacy. She also claims that she formally challenged the refund amount and that the Territory did not respond to her challenge. As a matter of Virgin Islands law, she says, that rendered the refund check a legal nullity, such that she's still owed the entirety of the $7,104 she originally claimed.[9]

---

[8] Federal Rule of Civil Procedure 68 says, in relevant part, that "a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms," which, if timely accepted and then filed with the court, requires the clerk to enter judgment. Fed. R. Civ. P. 68(a). If the offer is not timely accepted, it is considered withdrawn. Fed. R. Civ. P. 68(b).

[9] Duncan's argument relies heavily on the so-called "mirror code[, by which] Congress designed Virgin Islands tax law to mirror the tax laws in effect on the mainland." *Cooper v. Comm'r*, 718 F.3d 216, 219 (3d Cir. 2013); *see also* 48 U.S.C. § 1397 (providing that "[t]he income-tax laws in force in the United States of America and those which may hereafter be enacted shall be held to be likewise in force in the Virgin Islands of the United States, except that the proceeds of such

15

We need not confront the complexities of the mootness question here, however, because, even assuming Duncan's claims were mooted by the issuance of the refund check, the picking-off exception applies. The first condition of the exception is met because her claims were always of a type acutely susceptible to mootness.[10] Small claims for cash can always be mooted swiftly with payment of the amount claimed. *Cf. Weiss v. Regal Collections*, 385 F.3d 337, 347 (3d Cir. 2004) (holding that claims under the Fair Debt Collections

taxes shall be paid into the treasuries of said islands"). She claims that the Territory's Arithmetic Correction notice is the equivalent of a notice for an assessment arising out of "a mathematical or clerical error" under I.R.C. § 6213(b)(1), of which she allegedly requested an abatement pursuant to I.R.C. § 6213(b)(2)(A). She says that, from there, it was the Territory's responsibility to follow different deficiency procedures if it wanted to adjust her refund amount. I.R.C. § 6213(b)(2)(A). According to Duncan, that would have included filing a notice of deficiency, but the Territory never did so. *Id.* §§ 6212, 6501. Accordingly, she says, she is right back to being "entitled to a refund of the full amount claimed on her income tax return." (Opening Br. at 24.)

[10] For the same reason, we also need not decide whether Duncan's refusal to cash the issued check is analogous to the rejected settlement offers and offers of judgment at issue in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016), nor whether there is any merit to Duncan's argument that her purported challenge to the refund amount, once it went unanswered, rendered the check a nullity as a matter of Virgin Islands law. *See supra* note 9.

16

Practices Act, with a maximum recovery of $1,000 plus attorneys' fees and expenses, were "acutely susceptible to mootness"), *abrogated on other grounds by Campbell-Ewald*, 577 U.S. 153. And the Territory does not offer much reason to reach a contrary conclusion here. It argues simply that there are over 19,000 pending tax returns that claim refunds – and thus tens of thousands of viable class plaintiffs. But the size of the proposed class is irrelevant to how susceptible to mootness its claims are. The Territory also argues that it did not intend to pick off Duncan's claim. The Territory does not, however, point to any authority saying the picking-off exception requires an inquiry into the defendant's specific intent. What is required is a showing of "acute[] susceptib[ility] to mootness[.]" *Richardson*, 829 F.3d at 286.

The second condition for applying the picking-off exception to mootness is also met in this case. It has been clear from the beginning that Duncan seeks to represent a class. She labeled her original complaint a "Class Action Complaint" and expressly stated her desire to bring her lawsuit on behalf of others similarly situated. (D.I. 1.) She then promptly moved for class certification, just weeks after filing her original class-action complaint. *Cf. Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000) ("So long as a class representative has a live claim at the time [she] moves for class certification, neither a pending motion nor a certified class action need be dismissed if [her] individual claim subsequently becomes moot.").

Accordingly, because Duncan's claims are acutely susceptible to mootness and she expressed a clear intent to represent a class, we will relate her claims back to the date she filed her lawsuit, in August 2018, when she had not received a

refund check and thus had live claims based on the Territory's failure to pay. *Richardson*, 829 F.3d at 289-90. At that point, the case had no justiciability problems – either standing or mootness – and so we may proceed to the merits of the class-certification issues.

## B. Prerequisites to Class Certification Under Rule 23(a)[11]

As noted earlier, *supra* note 3, "[t]o satisfy Rule 23(a), a plaintiff must 'prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation.'" *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 265-66 (3d Cir. 2021) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)); Fed. R. Civ. P. 23(a)(1)-(4). The District Court's denial of class certification followed from its conclusion that Duncan failed to satisfy the last two requirements – typicality and adequacy of representation. We disagree in part with the District Court's analysis of typicality, and in whole with its analysis of adequacy. Those analyses "reflect[] application[s] of incorrect standards, [so] remand is appropriate." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 322 (3d Cir. 2008); *accord In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 603 (3d Cir. 2009) ("The

---

[11] "We review a class certification order for abuse of discretion, which occurs if the district court's decision 'rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.'" *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008).

District Court should reconsider … on remand under the correct legal standard[.]").

### 1. Typicality Under Rule 23(a)(3)

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). As we observed in *In re Schering Plough Corp. ERISA Litigation*, the typicality prerequisite is intended to "ensur[e] that the class representatives are sufficiently *similar* to the rest of the class – in terms of their legal claims, factual circumstances, and stake in the litigation – so that certifying those individuals to represent the class will be fair to the rest of the proposed class." 589 F.3d at 597. In a nutshell, typicality guards against class representatives who have "unique interests that might motivate them to litigate against or settle with the defendants in a way that prejudices the absentees." *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 63 (3d Cir. 1994). To weed out those atypical class representatives, courts must be satisfied about the following:

> (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*In re Schering Plough*, 589 F.3d at 599.

The District Court's analysis of typicality in this case contained two separate lines of reasoning.[12] As to Duncan's claim for a refund, the Court reasoned that the refund check later issued by the Territory "places Duncan in a substantially different position than the class she seeks to represent." (J.A. at 10.) According to the Court, while Duncan "is now necessarily engaged in a dispute as to [the Territory's] calculation of the magnitude of her overpayment[,]" the rest of the proposed class would ostensibly be in a "fundamentally different" dispute over the Territory's "statutory noncompliance and nonpayment[.]" (J.A. at 10.) As to Duncan's remaining claims for mandamus, declaratory relief, and injunctive relief, however, the Court held only that Duncan lacked constitutional standing to bring those claims.

With respect to the refund claim, we cannot say that the Court abused its discretion in concluding that the claim was not typical of the class. After Duncan received a refund check, her

---

[12] The District Court also noted in passing its concern that Duncan would be atypical with respect to corporations included in the putative class. In particular, the District Court observed that "the alleged injuries suffered by the absent corporate class members" are likely to differ from those experienced by Duncan. (J.A. at 11 n.5.) Our dissenting colleague argues we can affirm, at least in part, on that basis. But because the District Court relegated that observation to a footnote and the parties have not addressed the issue in any way, we believe it best to leave the matter for the District Court's consideration on remand, with input from the parties.

claim with respect to her 2016 tax refund, if any such claim still exists,[13] is that the Territory did not issue the check in the correct amount, not that the Territory failed to issue a check at all. Although her claim might be "the same as [that] of the class in terms of … the legal theory advanced[,]" insofar as her claim would continue to proceed as a refund action, *In re Schering Plough*, 589 F.3d at 599; *see also WIT Equip. Co. v. Dir., V.I. Bureau of Internal Revenue*, 185 F. Supp. 2d 500, 503 (D.V.I. 2001) (amount of tax liability may be litigated through a refund action), we are not concerned only with the legal theory of Duncan's claim; we are also concerned with "the factual circumstances underlying that theory[.]"[14] *In re Schering Plough*, 589 F.3d at 599.

---

[13] Again, Duncan argues that she "has not received the full value of the income tax refund (i.e., she is still owed $4,365.70, plus statutory interest)" (Opening Br. at 21), but she never actually points out a problem with the accuracy of the new calculation in the Arithmetic Correction notice.

[14] Duncan would have to prove additional facts to collect the $4,365.70 difference between the $7,104 claimed in her return and the $2,738.30 issued by the Territory. She would have to present evidence showing why the Territory's recalculation is incorrect. That information is not apparent from the Arithmetic Correction notice, and she has not yet explained why she questions the recalculation. Alternatively, she might pursue an argument similar to the one she presses here to dispute the District Court's mootness holding: that she is still owed a check for $7,104 because she formally challenged the refund amount, which rendered the first refund check a legal nullity. *See supra* notes 9-10 and accompanying text. Those disputes may or may not be a significant distraction

21

Those factual circumstances have nothing to do with the rest of the class's refund claims, which ostensibly rely only on the factual premise that the class members are entitled to refund checks but haven't yet received them. There is thus at least some meaningful risk that Duncan will have to "devote time and effort" to facts unique to her claim, which would come "at the expense of issues that are common and controlling for the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir. 2006).[15] For that reason, the District Court was then within its discretion in concluding that Duncan's refund action is not typical of those of the class.

---

from Duncan's role as class representative, but we cannot say that the District Court abused its discretion in deciding they would be.

[15] The existence of that meaningful risk justifies but does not compel the conclusion the District Court reached with respect to the refund claim. All we are saying is that the District Court was within the bounds of its discretion in concluding that Duncan's refund claim is atypical. In the analysis of the typicality prerequisite (or any other part of Rule 23), courts are to examine legal and factual issues as they then stand. *See Benjamin ex rel. Yock v. Dep't of Pub. Welfare*, 701 F.3d 938, 951 (3d Cir. 2012) ("[E]ven after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982))). We do not relate back the Rule 23 inquiry to the start of the litigation in the same way that we do with the picking-off exception, which only applies in the separate doctrinal context of constitutional mootness. *Cf. supra* Section II.A.

We cannot say the same, however, for the Court's holding with respect to the remaining claims for mandamus, declaratory relief, and injunctive relief, which rested on entirely different reasoning and likely raise issues that are of consequence to all class members alike. *See Baby Neal*, 43 F.3d at 63 (allowing modification of the class "so that the class action encompasses only the issues that are truly common to the class"). As summarized above, the Court decided Duncan lacked standing to bring those claims and therefore was atypical of the class. For the reasons already discussed, though, the Court's concerns over Article III justiciability were unfounded. *Supra* Section II.A. Justiciability doctrines thus will not "subject [Duncan] to [a] unique defense[] that could become a focus of the litigation[.]" *In re Schering Plough*, 589 F.3d at 599. And we see no other reason to conclude that Duncan's claims for mandamus, declaratory relief, and injunctive relief are atypical, nor has any been suggested. On remand, the District Court can consider whether such a reason exists. *See id.* at 600 (remanding for district court to consider typicality issues "it did not delve into"). It is worth bearing in mind, however, that the central point with respect to the claims for mandamus, declaratory relief, and injunctive relief is the question of systemic, arbitrary, and indefinite withholding of refunds, which is "essentially the same" for every class member, regardless of whether he or she is the lucky recipient of a long-delayed refund check. *Baby Neal*, 43 F.3d at 63. In other words, "[i]n fashioning injunctive relief, … a court would focus on the defendants rather than on the plaintiffs." *Id.* It thus seems unlikely that those claims will raise the same typicality concerns as did the refund claim.[16]

---

[16] While the Dissent agrees with our conclusion that the issuance of a refund check for some or all of Duncan's tax

## 2. Adequacy of Representation Under Rule 23(a)(4)

As to the adequacy prerequisite, the District Court applied a legal standard inconsistent with our precedent, so we will remand for it to reconsider whether Duncan has made a sufficient showing that intra-class conflicts of interest are absent.

The adequacy prerequisite demands that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Its primary purpose is "to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 393 (3d Cir. 2015). Thus, for a class representative to be adequate, she must "have a minimal degree of knowledge about the case and have no conflict of interest

refund renders her atypical with respect to her refund claim, it argues that the refund check will also necessarily "muddle her prospective claims for relief with an atypical defense." (Dissent at 2.) That Duncan received a refund check after a long delay, however, says nothing about the problem of systemic, arbitrary, and indefinite withholding of refunds, which is the central point of the other claims in the case. That problem is not only a matter of past practice (if Duncan's allegations are accepted as true), it is also a matter of predictable future practice and hence of prospective injury in fact for Duncan just as for other tax payers. The check the Territory tendered Duncan for the 2016 tax year does not change that at all.

with class counsel and members of the class[.]" *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020) (cleaned up); *see also Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012) ("[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class."). "A conflict must be fundamental to violate Rule 23(a)(4)." *Dewey*, 681 F.3d at 184 (internal quotation marks omitted).

Focusing on the conflict-of-interest component, the District Court held that Duncan came up short on the adequacy prerequisite because she failed to provide evidence to support a lack of a conflict. The Court emphasized that Duncan had to demonstrate that she satisfied Rule 23(a)(4) "by a preponderance of the evidence." (J.A. at 14 (citing *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 485 (3d Cir. 2015)).) Thus, it did not matter that the Court found unconvincing the Territory's argument that its "first to file[,] first to get paid" scheme would pit plaintiffs against each other in a race to get a refund, so all class members were in conflict with one another. (J.A. at 14.) What mattered, the Court decided, was that Duncan, as bearer of the burden of proof, did not put forth any evidence that intra-class conflicts were lacking.

On appeal, Duncan challenges that holding, arguing that she is "seeking systemic change" and that "each Virgin Islands taxpayer who is owed a tax refund is similarly situated with other Virgin Islands taxpayers who are owed tax refunds." (Opening Br. at 28-29.) She thus asserts she "is at a loss to identify a potential intra-class conflict." (Opening Br. at 29.) The Territory, for its part, rests on the District Court's reasoning, arguing that Duncan continues to provide nothing

more than "unsworn statements" of the sort that the District Court rejected.  (Answering Br. at 15-16.)  The Territory does not actually identify any conflicts of interest that Duncan has with the rest of the class.

It is true that "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence."  *In re Hydrogen Peroxide*, 552 F.3d at 320.  In other words, Rule 23 "does not set forth a mere pleading standard" under which a district court is to accept as true all factual allegations from a proposed class representative.  *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 183 (3d Cir. 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  Nor does the Rule establish "a prima facie showing or a burden of production" or, perhaps more obviously, "a presumption in … favor" of the party seeking certification.  *In re Hydrogen Peroxide*, 552 F.3d at 321.  At the same time, however, the law does not demand a plaintiff to prove a negative.  At least when it comes to a search for conflicts of interest, we have not found – and neither have the parties nor the District Court identified – any authority requiring the sort of evidence that the District Court here found lacking.  On the contrary, our case law supports the discretion of a district court to find adequacy of representation on a record like this.

Consider, for example, our basis for affirming the certification of a class of borrowers in *In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation*, 795 F.3d 380.  In that case – which had been before us on appeal twice before – five subclasses were created to ameliorate the statute-of-limitations problems identified in previous appeals.  *Id.* at 394.  Another significant difference between the third appeal and the previous ones was that the

26

plaintiffs had abandoned settlement negotiations and had formed a litigation class, which had the effect of eliminating a previous concern that plaintiffs with timely claims would be jockeying against those with arguably time-barred claims for portions of a fixed settlement amount.[17] *Id.* We concluded that no fundamental intra-class conflicts would prevent certification of the new litigation class, because all five subclasses were "pursuing damages under the same statutes and the same theories of liability, and the differences among them will not, at least as things presently stand, pit one group's interests against another." *Id.*

Of particular note here, we explicitly relied on the plaintiffs' joint consolidated amended complaint to identify the statutes and theories of liability on which they were pursuing their claims. *Id.* at 390-91, 394. And we quoted at length from their certification motion in order to explain the delineations among the five subclasses. *Id.* There is no indication that anything else was considered in deciding whether there were conflicts of interest within the class. There was no suggestion that anything further might be needed. Our approach sanctioned a court's making reasonable inferences, based on the way in which the class, the subclasses, and the claims are drawn up, to identify possible conflicts of interest and to decide whether those conflicts prevent certification. *Id.* at 394. We thus saw no abuse of discretion in the district court's decision to certify a class and subclasses. *Id.* at 394-95.

A similar analysis was employed in *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,

---

[17] *See infra* note 18.

421 F. Supp. 3d 12 (E.D. Pa. 2019), *aff'd*, 967 F.3d 264.  The district court there evaluated requests to certify three different classes.  *Id.* at 45.  In holding that there were no conflicts of interest within each class, the court never pointed to any evidence to support its finding.  As to the first class, it was "undisputed" that the named class representative's interests were aligned with members of the class.  *Id.* at 51.  And as to the latter two, the *defendant* "d[id] not identify, and [the district court could not] find, any likelihood of conflict of interest among the class members."  *Id.* at 68.  On appeal, we affirmed the district court's "thorough, thoughtful, and well-reasoned opinion," and we entertained (but rejected) the defendant-appellant's "speculative" arguments that there were conflicts of interest within one of the classes.  *In re Suboxone*, 967 F.3d at 267, 273.  Again, at no point did we refer to any evidence presented by the plaintiffs to support a conclusion that there were no such conflicts.

What seems clear from those precedents is that a plaintiff, to satisfy her burden to show she is an adequate representative of a proposed class, need not present evidence of the sort one might expect at summary judgment.[18]  *Accord*

---

[18] We set aside for present purposes those cases arising from a review of a proposed class settlement, in which conflict-of-interest issues seem to arise with some frequency.  *See* Nick Landsman-Roos, Note, *Front-End Fiduciaries: Precertification Duties and Class Conflict*, 65 Stan. L. Rev. 817, 823-24 (2013) ("[A]lmost all of the appellate-level treatment of class conflict has been on the back end, concerned with the possibility of conflicts of interest at settlement.").  In those cases, some class members will often object to the terms of a proposed settlement agreement, claiming that it allocates

1 Rubenstein § 3:55 ("The plaintiff has the affirmative burden of establishing each of the Rule 23(a) requirements, but the elements needed to establish adequacy of representation … may be established in the first instance by a simple demonstration of facts in the motion for class certification."). In fact, we're not sure what affirmative evidence of a lack of a conflict of interest would look like.[19]  Rather, the definition of

more favorable remedies to some in the class at the expense of others.  *E.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 606-07 (1997); *In re NFL*, 821 F.3d 410, 432 (3d Cir. 2016); *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 185 (3d Cir. 2012).  But even in those cases, the only other piece of "evidence" we have tended to consider, besides the definition of the class and the relief sought, is, quite naturally, the settlement agreement.  *See Dewey*, 681 F.3d at 185 ("To properly analyze the intra-class conflict alleged here, we must look to the class as certified as well as to the terms of the settlement agreement."); *In re NFL*, 821 F.3d at 433 ("[T]he terms of the settlement reflect that the interests of current and future claimants were represented in the negotiations.").

[19] Perhaps that is why some have proposed a different understanding of the adequacy-of-representation prerequisite. *See* Richard A. Nagareda, *Administering Adequacy in Class Representation*, 82 Tex. L. Rev. 287, 362-63 (2003) (reimagining the law of class actions "as the enlightened regulation of the market for representation of absent class members" and proposing a register of class-settlement agreements disclosing "a reasoned explanation of the choices made and the realistic alternatives foregone in the design of the settlement terms"); Jay Tidmarsh, *Rethinking Adequacy of Representation*, 87 Tex. L. Rev. 1137, 1139 (2009) (proposing

a class, the factual allegations of the complaint, and the relief sought are themselves highly indicative of a putative class representative's theory of the case and whether she will seek relief that benefits the entire class. *Cf. Dewey*, 681 F.3d at 184 ("A conflict concerning the allocation of remedies amongst class members with competing interests can be fundamental and can thus render a representative plaintiff inadequate."). That information can be – and, indeed, has been – considered in evaluating intra-class conflicts. *In re Cmty. Bank*, 795 F.3d at 390-91, 394; *In re Suboxone*, 967 F.3d at 267, 273. After reviewing that information, hearing the parties' arguments, and making reasonable inferences, a district court may find that an intra-class conflict "more likely than not" is absent. *In re Hydrogen Peroxide*, 552 F.3d at 320. Of course, if a court concludes otherwise based on that same type of information, it may deny the certification motion on that basis too. *See Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 150 (3d Cir. 2008) (vacating certification order because, "[a]s reflected by the allegations of just the named plaintiffs," the "proposed class members will likely need to pursue different, and possibly conflicting, legal theories to succeed").

To be clear, that mode of analysis is not a reversion to "a mere pleading standard." *Ferreras*, 946 F.3d at 183

---

a "recast[ing]" of the adequacy prerequisite such that "[r]epresentation by class representatives and counsel is adequate if, and only if, the representation makes class members no worse off than they would have been if they had engaged in individual litigation"). As interesting as those proposals may be, we are bound to follow our existing precedent.

(quoting *Dukes*, 564 U.S. at 350). A district court need not accept as true, for example, a putative class representative's bare allegation that there is an "alignment of interests and incentives between the representative plaintiffs and the rest of the class[,]" *Dewey*, 681 F.3d at 183, or, as here, Duncan's argument that "there are no intra-class conflicts" (Opening Br. at 29). But a court ought to examine the documents bearing directly on how the class is drawn, what the complaint asserts to be the operative facts, and what relief is sought (in addition to any other information or evidence bearing on whether there is a conflict of interest), and then make an independent finding on whether the interests of that class, more likely than not, are aligned with the putative class representative.

With that clarification, we will remand for the District Court to reconsider whether Duncan has established that she is an adequate representative of the proposed class.[20]

---

[20] Our dissenting colleague notes that, because he would affirm the denial of class certification on grounds of atypicality, he need not address Duncan's adequacy as a class representative. Nevertheless, he says, "the overlap in these concepts seems likely to lead to the same conclusion that the District Court did not abuse its discretion." (Dissent at n.2.) And, while not disputing our conclusion that the District Court applied an incorrect legal standard in ruling on the adequacy of Duncan's representation of the class, our colleague also seems to suggest that remanding on that ground is insufficiently deferential to the District Court because, on remand, the District Court may yet conclude that Duncan is an inadequate representative. (Dissent slip op. at 5-6.) But the District Court, for all its careful work in deciding the class certification motion, did apply the wrong standard on the

31

question of adequacy, and application of an incorrect legal standard is by definition an abuse of discretion. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 312 & n.9 ("A district court by definition abuses its discretion when it makes an error of law.") (quoting, *inter alia*, *Koon v. United States*, 518 U.S. 81, 100 (1996)). Accordingly, remand for application of the correct legal standard is a proper course and, we believe, the better one.

On remand, if the Court determines that the prerequisites of Rule 23(a) have been met, it should also consider in the first instance whether to certify the class under Rule 23(b)(2) ("A class action may be maintained if Rule 23(a) is satisfied and if: ... the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]). Duncan urges that we make that decision ourselves but, "[p]rior to certifying a class, a *district court* must resolve every dispute that is relevant to class certification." *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 183 (3d Cir. 2019) (emphasis added). For that reason, we have consistently remanded for district courts to consider Rule 23 requirements that they did not previously reach. *E.g.*, *Richardson v. Bledsoe*, 829 F.3d 273, 290 n.15 (3d Cir. 2016) ("On remand … the District Court may consider the additional class certification requirements that it did not previously reach when it erroneously concluded that the class was unascertainable."); *Byrd v. Aaron's Inc.*, 784 F.3d 154, 171 (3d Cir. 2015) ("[W]e will remand to the District Court to consider the remaining Rule 23 certification requirements in the first instance."); *Shelton v. Bledsoe*, 775 F.3d 554, 565 (3d Cir. 2015) ("On remand, the district court must consider

## III. CONCLUSION

For the foregoing reasons, we will vacate the District Court's order denying Duncan's class-certification motion and remand for further consideration.

---

whether the properly-defined putative class meets the remaining Rule 23 requirements for class certification.").

MATEY, *Circuit Judge*, dissenting.

I agree with the majority's clear distinction between the requirements of Article III and the directives of Rule 23. So too, the application of those principles to Duncan's putative class claim for damages. But I apply those same conclusions to the rest of Duncan's Complaint and, mindful that district courts "possess[] broad discretion to control proceedings and frame issues for consideration under Rule 23," I would affirm the judgment denying class certification. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008)*.* So I respectfully dissent.

**I.**

Class certification starts with the trial court determining whether "the putative class satisfies the numerosity, commonality, typicality, and adequacy of representation provisions of Rule 23(a)." *In re Citizens Bank, N.A.*, 15 F.4th 607, 612 (3d Cir. 2021). A searching inquiry, as certification is only appropriate "if, after rigorous analysis, the district court concludes that plaintiffs satisfy each and every element by a preponderance of the evidence." *Id.* (cleaned up). If the district court "harbor[s] doubt as to whether a plaintiff has carried her burden under Rule 23, the class should not be certified." *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 483 (3d Cir. 2018).

The Rule 23(a)(3) typicality analysis ensures "that the class representatives are sufficiently similar to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed

1

class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009) (emphasis omitted). Here, two of the doubts raised by the District Court about Duncan's typicality justify its finding that Duncan did not satisfy her burden.[1]

## A.     Duncan Has Her Tax Refund

The District Court and the majority agree that Duncan's refund receipt rendered her atypical. That is surely correct because with check in hand, Duncan was in a "substantially different position than the class she seeks to represent." App. 10. Yet much of her Complaint survives because, the majority reasons, giving Duncan her tax refund does not muddle her prospective claims for relief with an atypical defense.

But why? The Virgin Islands will still say that Duncan, like other taxpayers, has received her refund.[2] And "[i]t is well established that a proposed class representative is not 'typical' under Rule 23(a)(3) if [she is] subject to a unique defense that is likely to become a major focus of the litigation." *Schering*, 589 F.3d at 598 (cleaned up). That is reason enough to "motivate [her] to litigate against or settle with the defendants in a way that prejudices the absentees." *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 63 (3d Cir. 1994).[3]

---

[1] The third, as the majority explains, improperly merged Article III and Rule 23(a).

[2] The Virgin Islands explained that Duncan's refund was part of a "batch" released by the Bureau. Response Br. 3.

[3] Duncan also contends, in several pages of briefing, that her refund represented less than what she was owed. An argument she may raise but the class may not, because they

2

Duncan disagrees. She analogizes the refund to "an unaccepted settlement offer" under Federal Rule of Civil Procedure 68,[4] which cannot moot her case. Opening Br. 16–18 (quoting *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165–66 (2016)). But the Virgin Islands did not *offer* Duncan anything under Rule 68 or otherwise. It returned Duncan what she was owed. And, of course, Duncan's argument also sneaks in standing to satisfy Rule 23(a), which the majority agrees will not suffice.[5]

---

received no refunds to contest—providing more evidence of her atypicality.

[4] Stating, in relevant part: "At least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms . . . . [But] [a]n unaccepted offer is considered withdrawn . . . ." Fed. R. Civ. P. 68(a)–(b).

[5] A point the Supreme Court has long emphasized. *See, e.g., Sosna v. Iowa*, 419 U.S. 393, 403 (1975) (finding lead plaintiff's claim was not moot while noting "the district court must [still] assure itself that the named representative will adequately protect the interests of the class."); *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 405–07 (1980) ("Our conclusion that the controversy here is not moot does not automatically establish that the named plaintiff is entitled to continue litigating the interests of the class. It does shift the focus of examination from the elements of justiciability to the ability of the named representative to fairly and adequately protect the interests of the class." (cleaned up)). Likewise, the picking off doctrine is a "mootness exception," not a Rule 23(a) exception, and cannot save Duncan's claim. *Richardson v. Bledsoe*, 829 F.3d 273, 286 (3d Cir. 2016).

**B.    Duncan's Claim Cannot be Typical of a Corporate Tax Refund**

Nor can I see an abuse of discretion in the District Court's conclusion that Duncan was not typical of the forty-nine corporations included in the proposed class. Including those dissimilar members, the District Court explained, "may provide an independent basis to find that Duncan's claims are not typical." App. 11 n.5. And that cannot be seriously questioned. Corporate taxpayers do not follow the same schedules, in code or calendar, as individuals. Making Duncan entirely atypical, and therefore an unsuitable representative of the proposed class "in terms of their legal claims, factual circumstances, [or] stake in the litigation." *Schering*, 589 F.3d at 597.[6]

## II.

Duncan responds to all of this by forecasting a parade of horribles. What if the Virgin Islands issues refunds for the

---

[6] Finding Duncan fails Rule 23(a)(3) typicality, I need not address adequacy under Rule 23(a)(4). Though the overlap in these concepts seems likely to lead to the same conclusion that the District Court did not abuse its discretion. *See Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006) ("The Supreme Court has noted the typicality and adequacy inquiries often tend to merge because both look to potential conflicts and to whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." (cleaned up)).

4

next representative? And the next? Fair questions, grounded in the debts and delays alleged by many challenges to the financial practices of the Virgin Islands simmering on district court dockets. *See, e.g.*, *Gov't Emps. Ret. Sys. of V.I. v. Gov't of V.I.*, 995 F.3d 66, 103–05 (3d Cir. 2021) (Matey, J., concurring in part and dissenting in part). But facts do not march in Duncan's parade. Indeed, even after some discovery, there is no evidence that the Virgin Islands did anything more than legitimately pay Duncan her refund. And even if that does not moot her claim, it can leave her outside looking in, "unless the defendant is executing a strategy of buying off class representatives successively in an effort to derail the suit." *See Culver v. City of Milwaukee*, 277 F.3d 908, 912 (7th Cir. 2002) (Posner, J.). Searching only for an abuse of discretion, Duncan's speculations cannot rise to that level.

Finally, says Duncan, the intra-class conflicts and individual defenses do not prove she cannot represent the class. I agree. But "may" is not "must," and while a lead plaintiff can still lead despite differences in claims and controversies,[7] nothing in Rule 23 demands it.[8] Holding otherwise risks

---

[7] *See, e.g.*, *DL v. D.C.*, 860 F.3d 713, 725–26 (D.C. Cir. 2017) (representatives with mooted claims still typical and adequate because they "displayed a strong commitment" to resolution and "responded to all developments in a timely and professional fashion" (cleaned up)); *Snyder v. Ocwen Loan Servicing, LLC*, 258 F. Supp. 3d 893, 905 (N.D. Ill. 2017) (representatives adequate because they "maintain[ed] interests in pursuing statutory damages").

[8] *See, e.g.*, *Pettrey v. Enter. Title Agency, Inc.*, 584 F.3d 701, 707 (6th Cir. 2009) (representatives that "settled and released all of their claims" inadequate); *Culver*, 277 F.3d at

handicapping the discretion of district courts, and upending the careful balance established in Rule 23. Preferring that predictable formula, I would affirm the District Court's denial of class certification. For that reason, I respectfully dissent.

---

912 (representative inadequate where claim was moot, he "lack[ed] . . . any material stake in prosecuting th[e] litigation," and showed "lack of energy"); *see also Reed v. Bowen*, 849 F.2d 1307, 1312 (10th Cir. 1988) ("[W]e rely on the district court to determine whether mooted named plaintiffs will remain adequate class representatives.").